**In re William Halvor SCHULTZ and Madelyn Carol Schultz, dba W.H. Schultz Construction Co., Inc.; Hedlund & Schultz Construction Co., Inc.; and Hedlund Enterprises.**

**TEAMSTERS LOCAL 533 and the Trustees of the Teamsters Health & Welfare Trust Fund, et al., Plaintiffs,**

v.

**William Halvor SCHULTZ and Madelyn Carol Schultz dba W.H. Schultz Construction Co., Hedlund & Schultz Construction Co., Inc.; and Hedlund Enterprises, Defendants.**

Bankruptcy No. 83–747.

Adv. No. 83–393.

United States Bankruptcy Court, D. Nevada.

Feb. 22, 1985.

Robert M. Sader, Nathan M. Jenkins, Reno, Nev., for plaintiffs.

Alan R. Smith, Reno, Nev., for defendants.

## MEMORANDUM DECISION

ROBERT C. JONES, Bankruptcy Judge.

### Introduction

Plaintiffs—local labor unions and trustees of various union benefit funds—filed this adversary proceeding to determine the dischargeability of debts incurred by Schultz while engaged in the business of construction contracting. The dispute centers principally on the proper interpretation on Nevada's "contractor embezzlement" statute—Nev.Rev.Stat. § 205.310—and its relationship to Bankruptcy Code § 523(a)(4), which excepts from discharge certain debts incurred in a fiduciary capacity, for embezzlement, or larceny. A trial was held on May 8, 1984, and the matter submitted for the Court's decision. For the reasons set forth below, the Court concludes that the subject debts are dischargeable.[1]

### Facts

The facts recited below are derived from the stipulations of the parties, uncontroverted testimony, and documentary evidence. Disputed issues are expressly identified as such.

William H. Schultz, the debtor defendant, is a licensed construction contractor, and has operated through several business entities during past years. At various times, he employed members of the Teamsters Local 533, Laborers Local 169, and Operating Engineers Local 3. The employment agreements obligated Schultz inter alia to report the number of hours worked by union members and to make certain payments for fringe benefits to union trust funds, represented in this action by their Trustees. Audits were performed when delinquencies in payments were discovered.

The fringe benefits unpaid to Teamsters and Laborers trust funds total $1,428.80 and $5,237.61 respectively, plus liquidated damages, interest and audit fees. These figures represent delinquencies for the months of April through October of 1981. During that time Schultz owned and operated W.H. Schultz Construction Company, and was involved in the Warren Estates project, for which Laborers and one Teamster—the debtor's brother—supplied labor. Although Schultz was paid in full on his approximately $1 million bid, expenses ran much higher, and the project showed a $200,000 loss.

The benefits due the Operating Engineers trust funds total $1,018.13 in principal amount. The delinquencies in payments occurred during 1979 and mid 1980 in connection with the Mount Rose project, for which the bid was approximately $4.5 million. At that time, Schultz was associated with Mr. Hedlund and operated through a corporation, Hedlund & Schultz Construction Co., Inc. Sometime in the Fall of 1980, Schultz sold all of his stock to Hedlund, and dissociated himself from the corporation. The Mount Rose job was completed by the corporation in the summer of 1981; the corporation received at least some payments on its own contract after the split of Hedlund and Schultz.

The only contested factual issue involves this debt to the Operating Engineers. Schultz claims that the debt is a corporate liability, rather than his own personal obligation, alleging that it was the corporation which hired the workers and contracted with the union. The Operating Engineers contend that the only Collective Bargaining Agreement in effect during the relevant time period was signed by Schultz in 1977 in his individual capacity. They allege that Schultz failed to notify the union of his

---

1. Although the complaint was entitled "Objection to Discharge and Complaint to Determine the Dischargeability of Debts", Plaintiffs at no time addressed any issues other than those raised by § 523. Therefore, debtors will be granted a general discharge pursuant to 11 U.S.C. § 727.

This memorandum decision shall constitute findings of fact and conclusions of law. Bankruptcy Rule 7052.

change in business entity in 1978 with the formation of Hedlund & Schultz Inc., and failed to sign a new agreement in his corporate capacity so as to obligate the corporation to pay this debt. However, the resolution of this dispute is unnecessary for the purposes of this decision.

*Discussion*

Plaintiffs contend that the debts at issue are nondischargeable under Bankruptcy Code § 523(a)(4) as they arise from defalcation in a fiduciary capacity, or alternatively, from embezzlement.[2]

■■■ Dischargeability provisions are to be strictly construed against the creditor and in favor of the debtor, so as to effectuate the Congressional policy of providing the honest debtor with a fresh start. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Gregg v. Rahm (In re Rahm)*, 641 F.2d 755, 756–57 (9th Cir.1981). The party opposing discharge has the burden of proving that the debts fall within one of the specifically enumerated exceptions. *Reiten Equipment, Inc. v. Wightman (In re Wightman)*, 36 B.R. 246, 250 (Bankr.D.N.D. 1984); *Joseph Lorenz, Inc. v. Thomas (Matter of Thomas)*, 21 B.R. 553, 556 (Bankr.E.D.Wis.1982). Plaintiffs here have failed to prove that the debtors acted as fiduciaries in the strict sense required by the Code, or that they committed an act of embezzlement as that term is used in § 523(a)(4).

### A. *Fiduciary Capacity*

■■■ The meaning of "fiduciary" in § 523(a)(4) is an issue of federal law which limits its application to express or technical trusts. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 758 (9th Cir.1981); *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir.1980).[3] The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context, thus excluding ordinary commercial relationships from the reach of § 523(a)(4). *See Angelle, supra*, at 1338–39 and cases cited therein; *Rhode Island Lottery Commission v. Cairone (In re Cairone)*, 12 B.R. 60, 62 (Bankr.D.R.I. 1981). The debt alleged to be nondischargeable must arise from a breach of the trust obligations imposed by law, separate and distinct from any breach of contract; thus, the trustee's duties must be independent of the contractual relationship between the parties. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir.1982). Finally, the trust must be imposed prior to any act of wrongdoing; the debtor must have been a "trustee" before the wrong and without reference to it. *Davis v. Aetna, supra*, 293 U.S. at 333, 55 S.Ct. at 153; *Pedrazzini, supra*, at 758. These requirements eliminate constructive, resulting or implied trusts. *Id.* at 759; *Carlisle Cashway, supra*, at 251; *Angelle, supra*, at 1338–39.

■■■ Although the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be consulted to determine when a trust in this strict sense exists. *Pedrazzini*, 644 F.2d at 758. The general characteristics of an express trust

---

**2.** 11 U.S.C. § 523(a)(4) provides in pertinent part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while action in a fiduciary capacity, embezzlement or larceny. . . .

"Bankruptcy Code" and "Code" refer to the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 to 151326. "Bankruptcy Act" and "Act" refer to the former federal law, 11 U.S.C. §§ 1 to 1103 (repealed 1979).

**3.** These cases were decided under the predecessor of § 523(a)(4)—Bankruptcy Act § 17(a)(4)— which excepted from discharge debts created by "fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity". Since these provisions are almost identical, the case law construing Act § 17(a)(4) should be followed in interpreting Code § 523(a)(4). *Littlejohn v. Englund (In re Englund)*, 20 B.R. 957, 961 (Bankr.E.D.Mich. 1982). *See* 3 Collier on Bankruptcy ¶ 523.14 at 523–99 to 100 (15th ed. 1984).

include an explicit declaration of the creation of a trust, a clearly defined trust *res*, definite beneficiaries, and a clear intention to create a trust. *Schlecht v. Thornton (In re Thornton)*, 544 F.2d 1005, 1007 (9th Cir.1976); *Soady v. First National Bank of Nevada*, 82 Nev. 97, 102, 411 P.2d 482 (1966). The intent to create a trust relationship, rather than a contractual relationship, is the key element in determining the existence of an express trust. *Thornton* at 1007. This trust may arise consensually, by explicit agreement between the parties, *e.g., Gonzales v. Raiser Construction Co., Inc. (In re Gonzales)*, 22 B.R. 58 (Bankr. 9th Cir.1982), or it may arise by operation of a state statute which imposes trust-like obligations on those entering into certain kinds of contracts, *e.g. Besroi Construction Corp. v. Kawczynski (In re Kawczynski)*, 442 F.Supp. 413 (W.D.N.Y. 1977) (New York Lien Law). However, "[t]he precise manner in which a trust is created, by consent or by statute, is of little importance. Rather, the focus should be on whether true fiduciary responsibilities have been imposed". *Pedrazzini*, 644 F.2d at 758 n. 2.

Plaintiffs here have conceded that the parties' contracts do not create the requisite trust, but merely establish an ordinary commercial relationship between the debtors and the trust funds.[4] Plaintiffs' Trial Statement at 11. Instead, Plaintiffs urge that the "fiduciary capacity" referred to in § 523(a)(4) is imposed by statute, in particular Nev.Rev.Stat. § 205.310:

*Contractor failing to pay for labor or material.* Every person having entered into a contract to supply any labor or materials for the value or price of which any lien might lawfully be filed upon the property of another, who shall receive the full price or consideration thereof, or the amount of any account stated thereon, or part payment thereon, shall be deemed to receive the same as the agent of the party with whom such contract was made, his successor or assign, for the purpose of paying all claims for labor and materials supplied, insofar as the money so received will pay such claims.

This statute appears in the embezzlement section of Chapter 205 which concerns "Crimes Against Property." The general definition of embezzlement is found at Nev. Rev.Stat. § 205.300, which imposes criminal liability on an agent who uses or appropriates property for any purpose other than that for which it was deposited or entrusted.[5] According to Plaintiffs, § 205.310, along with other Nevada statutes pertaining to the duties of employers generally to pay agreed upon compensation,[6] creates a special relationship between the contractor and the union members, analogous to that found by other courts to give rise to a statutory trust within the purview of § 523(a)(4).

By now, many courts have had an opportunity to consider whether particular state statutes give rise to an "express trust" in the owner-contractor-subcontractor context. Although it may appear at first that the courts are in substantial disagreement,

4. *See, e.g. Livolsi v. Johnston (In re Johnston)*, 24 B.R. 685, 687 (Bankr.W.D.Pa.1982) (the obligation to pay benefits to a trust fund does not establish the debtors as trustees of the fund, but merely as parties contractually liable for payment to the Trustee).

5. Nev.Rev.Stat. § 205.300:
 1. Any bailee of any money, goods or property, who shall convert the same to his own use, with the intent to steal the same or to defraud the owner or owners thereof and any agent, manager or clerk of any person, corporation, association or partnership; or any person with whom any money, property or effects shall have been deposited or entrusted, who shall use or appropriate such money, property or effects or any

part thereof in any manner or for any other purpose than that for which the same was deposited or entrusted, shall be guilty of embezzlement, and shall be punished in the manner prescribed by law for the stealing or larceny of property of the kind and name of the money, goods, property or effects so taken, converted, stolen, used or appropriated.

6. Plaintiffs point in particular to Nev.Rev.Stat. § 608.100 which declares it unlawful for an employer to pay lower wages or other compensation than that agreed upon; and Nev.Rev.Stat. § 613.125 which also imposes criminal penalties on an employer who willfully or with intent to defraud fails to make required payments to any employee health, welfare, or benefit fund.

a careful examination of the statutes at issue does reveal a pattern.

Generally, those courts which have found the requisite trust were dealing with statutes which expressly designate the funds received by the contractor as "trust funds", and impose specific duties on the contractor for the disposition of the funds.[7] See, *e.g. Cary Lumber v. Bell*, 615 F.2d 370 (5th Cir.1980) (Oklahoma Lien Trust Statutes); *Besroi Construction v. Kawczynski, supra,* (New York Lien Law); *Climax Molybdenum Company v. Specialized Installers, Inc. (In re Specialized Installers, Inc.)* 12 B.R. 546 (Bankr.D.Colo. 1981) (Colorado Lien Trust Statute); *Carlisle Cashway v. Johnson, supra,* (Michigan Building Contract Fund Act). For example, in *Kawczynski*[8] the statute under consideration requires that the funds received by contractors for the improvement of real property be held in trust for the benefit of subcontractors and suppliers; that the contractor segregate and keep detailed records of the funds received; and that the trust funds be used to pay subcontractors and suppliers before other business expenses. Failure to adhere to this priority scheme would constitute larceny. The court concluded that the statutory scheme satisfies the "express trust" requirement for dischargeability purposes, as the trust is imposed by unambiguous statutory language, independent of the contractual relationship; the trust commences at the time the contractor first receives payment, thus the fiduciary duties are imposed prior to rather than by virtue of any act of wrongdoing; and the trustee is charged with extensive, affirmative duties in managing the trust. 442 F.Supp. at 417.

On the other hand, when dealing with general statutes which only impose criminal or other penalties for failure of a contractor to make a certain disposition of funds, the vast majority of courts, including the Court of Appeals for the Ninth Circuit, have refused to find the requisite "fiduciary capacity". See, *e.g. Pedrazzini, supra* (9th Cir.) (California law)[9]; *Thornton, supra* (9th Cir.) (Oregon law); *Angelle, supra* (5th Cir.) (Louisiana law); *Wilson v. Mettetal (In re Mettetal),* 41 B.R. 80 (Bankr.D.Tenn.1984). See also *Devaney v. Dloogoff (In re Dloogoff),* 600 F.2d 166 (8th Cir.1979) (Nebraska law). These courts reason that if any special "trust" relationship is created by such statutes, it arises only by virtue of an act of wrongdoing, and cannot be said to exist prior to the wrong and independent of it. As discussed above, this type of trust is excluded from the federal definition of "fiduciary".[10]

Plaintiffs urge that the Court follow the Tenth Circuit's decision in *Allen v. Romero (In re Romero),* 535 F.2d 618 (10th Cir. 1976), apparently the only case which does not fit the above pattern. There, the contractor received advances which he failed

7. *Cf. Eau Claire County v. Loken (In re Loken),* 32 B.R. 205 (Bankr.W.D.Wis.1983). The court found the public officer—a register of deeds—to be a fiduciary although the statute at issue does not refer to him as a "trustee" or the funds collected as "trust funds". To reach its conclusion, the court analyzed the purpose of the statutory scheme which imposes specific duties on the register, and the nature of the office itself, which the court found to be imbued with "public trust", significantly different from ordinary commercial relationships.

8. Cited with approval by the Ninth Circuit in *Pedrazzini,* 644 F.2d at 759.

9. In *Pedrazzini,* for example, the Ninth Circuit construed a statutory scheme which prescribes disciplinary action for a contractor who diverts funds intended for the completion of a particular project, or who fails to pay subcontractors within ten days of the receipt of a progress payment; and which imposes criminal penalties on a contractor who receives money for the purpose of obtaining or paying for labor and supplies, but wrongfully diverts the funds to some other use. 644 F.2d at 758.

10. See also *Toledo Area Construction Workers Health and Welfare Plan v. Hayden (In re Hayden),* 44 B.R. 9, 12 B.C.D. 520 (Bankr.N.D. Ohio 1984). Although the statute under consideration refers to the contractor as a "trustee", he becomes a trustee only of "funds required to be paid", and the trust arises only when payment is due. Given this specific language, the court classified the trust as one arising *ex maleficio,* i.e. by virtue of an act of wrongdoing. Consequently, the court found that the debtor was not a fiduciary for purposes of § 523(a)(4).

to use for the payor's construction project. In holding that the contractor acted in a fiduciary capacity, the court construed a New Mexico statute which provides for revocation of the contractor's license if funds advanced for the completion of a particular contract are diverted to other purposes. The court reasoned that because a license must be obtained prior to any dealings with particular parties, the trust arises prior to and independent of the claim of misappropriation. 535 F.2d at 622. The soundness of the *Romero* decision has been questioned by many courts, and its reasoning expressly rejected by the Fifth ˙Circuit in *Angelle*, 610 F.2d at 1340, and the Ninth Circuit in *Pedrazzini*, 644 F.2d at 759. The criticism advanced by these courts is based on the principle that a trust cannot arise in the abstract, upon obtaining a contractor's license, but only among particular parties. *Angelle, supra,* at 1340 n. 11.

Unfortunately, the instant matter does not fit neatly within one or the other main lines of cases discussed so far. Statutes construed in both groups prescribe criminal penalties for a contractor who diverts funds to an unauthorized purpose, as does Nev.Rev.Stat. § 205.310 when read in conjunction with § 205.300. As in the *Pedrazzini* group, the funds received are not declared to be trust funds, nor the contractor a trustee, and no typical fiduciary duties are imposed, such as the duty to segregate and account for funds. However, § 205.-310 does deem the contractor to be an agent of the payor of the funds, for the purpose of paying the claims of laborers and suppliers. Arguably, this language gives rise to a special relationship independent of the parties' contractual agreement, imposed at the time funds are paid to the contractor, thus prior to any claim of wrongdoing, and which requires a specific disposition of funds. The *Romero* problem is avoided because, one might argue, the relationship does not arise in the abstract, but between particular individuals—the payor of the funds and the contractor—

since the contractor is "deemed to be an agent" only after he has received payment. Although the general rule is that the defalcations of agents do not create nondischargeable debts, *see* 3 Collier on Bankruptcy ¶ 523.14 at 523–100; *Great American Insurance Co. v. Storms (In re Storms),* 28 B.R. 761 (Bankr.E.D.N.C.1983); *Air Traffic Conference of America v. Paley (In re Paley),* 8 B.R. 466 (Bankr.E.D.N.Y.1981); under special circumstances, an agent may be found to act in a fiduciary capacity within the ambit of § 523(a)(4). See, *e.g. Estate of Hensel v. Barker (In re Barker),* 40 B.R. 356 (Bankr.D.Minn.1984); *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78 (4th Cir.1954) (Act case).

In *Hensel v. Barker,* Judge Hill reconciles the "agency" cases by noting that one acts as a fiduciary in the strict sense only when the money or property he handles is not his own or for his own benefit but for the benefit of another.[11] 40 B.R. at 359. If an agent has a "present right" to receive payment, then the money advanced belongs to the agent, and his only remaining duties are contractual. *Id.* In *Paley, supra,* and *Storms, supra,* the agents had a right to sell a product and to receive payment for the product sold; hence, the remaining obligation to pay the principal was not a fiduciary but a contract debt. However, the agents in *Hensel,* and *Hamby* were real estate agents who simply collected funds of another under the obligation to use the funds for a specific purpose. In *Hensel,* the agent received the proceeds from the sale of real property and was to use the funds to make certain investments for his principal; in *Hamby,* the agent was given funds by a real estate purchaser for the purpose of paying off the liens on the property. In neither case could it be said that the agent had a present right to receive the funds.

 Applying these principles to the matter *sub judice,* the Court is not con-

---

**11.** This is a necessary but not sufficient condition. See, *e.g. Spurgeon v. Adams (In re Adams),* 24 B.R. 252 (Bankr.W.D.Mo.1982) (bailee not a fiduciary), and the discussion in *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891).

vinced that the contractor who receives payment holds those funds as a fiduciary in the strict sense required by the Code. Where a contract provides for certain services at certain prices, and there is a transfer of money within the contract price, ownership as well as possession passes, and all that remains is a contractual obligation. *Stanshine v. Kalmar (In re Kalmar)*, 18 B.R. 343, 345 (Bankr.E.DE.Penn. 1982) (funds advanced to a construction contractor become his own property). Therefore, when Schultz received payment pursuant to his own contract within the contract price, ownership of the funds was to pass to him. The Nevada statutes are not clearly intended to so drastically alter the contractor's presumed property rights in the funds received, as to create a trust. The language of Nev.Rev.Stat. § 205.310 is certainly not unambiguous, and no fiduciary duties are spelled out. *Compare Kawczynski, supra.* At most, the statute creates an agency of a type excluded from the reach of § 523(a)(4): Even if Schultz became an "agent" by operation of the statute, nevertheless, he had a "present right" to the funds received and they became his property. Since one cannot be a fiduciary in the strict sense when handling one's own money, Schultz' obligation to pay the fringe benefits was a contractual—not a fiduciary—debt.

■ Moreover, in order for a debt to arise from a default in a fiduciary capacity, the fiduciary duty must be owed directly to the complaining creditor. *Intercontinental Life Insurance Co. v. Good (In re Good)*, 33 B.R. 163, 166 (Bankr.M.D.Fla. 1983). Nev.Rev.Stat. § 205.310 concerns a contractor's agency relationship with the payor, rather than with suppliers. An agent's duty to his principal does not itself give rise to a duty to third parties; hence, an agent is not liable to others for breach of a duty which he owes only to his principal. 3 Am.Jur.2d *Agency* § 300. Although a fiduciary duty to third parties might arise if the agent receives property "in trust", for their benefit, Restatement (Second) of Agency § 342(3), the Nevada statutes do not purport to create this relationship. Therefore, regardless of his duty to the payor, the contractor's duty to suppliers remains purely contractual. The fact that criminal penalties might be imposed for failure to adhere to the state's priority scheme does not change what would otherwise be an ordinary commercial relationship to one of trustee-beneficiary.

■ The Court's interpretation of § 205.310 does not render meaningless the language which deems the contractor to be an agent. Since § 205.310 does not itself describe any crime, the apparent purpose of that troublesome provision is solely to bring the contractor within the definition of one who may be liable for embezzlement under Nev.Rev.Stat. § 205.300.[12] Thus, the statute creates an "agency" only for the purpose of criminal liability.[13]

---

**12.** Quoted at note 5, *supra.*

**13.** This construction accords with the two Nevada Supreme Court cases dealing with § 205.310. In *Walker Bank & Trust Co. v. Smith,* 88 Nev. 502, 508, 501 P.2d 639 (1972), the court dismissed the argument that the statute creates a trust with the comment that "the mentioned statute ... concerns the crime of embezzlement. It does not purport to create a civil liability", citing its earlier holding *in Zalk-Josephs v. Wells Cargo,* 77 Nev. 441, 366 P.2d 339 (1961). The court directed suppliers of labor and materials to look to other statutes for civil remedies. 88 Nev. at 508, 501 P.2d 639. In *Zalk-Josephs,* the court refused to allow a materialman to use § 205.310 as a predicate for civil liability of the payor of the contract funds, on the theory that the "principal" is liable for the defaults of the

"agent". In rejecting this line of reasoning, the court noted that the purpose, meaning, and intent of the statute was not to create a civil liability under the theory of agency. 77 Nev. at 445–446, 366 P.2d 339.

Under these circumstances, the bankruptcy court should not use § 205.310 as the basis for finding an express or technical trust. Where a criminal statute provides for civil liability, this weighs in favor of using the statute as a predicate for excepting a debt from discharge. *Wilmington Trust Co. v. Martin (In re Martin),* 35 B.R. 982, 988–989 (Bankr.E.D.Pa.1984). Conversely, if a statute is not intended to apply in a civil context, and labor and material suppliers are to look elsewhere for civil remedies, the statute cannot give rise to a special fiduciary relationship between contractors and suppliers as required by § 523(a)(4).

Plaintiffs Operating Engineers might have argued that Schultz acted in a fiduciary capacity as an officer of the corporation involved in the Mount Rose job. Several courts have held that the fiduciary status of a corporate officer satisfies the "fiduciary capacity" requirement of the Code. See, *e.g. John P. Maguire & Co., Inc. v. Herzog*, 421 F.2d 419 (5th Cir.1970) (Act case); *United Virginia Bank v. Fussell (In re Fussell)*, 15 B.R. 1016 (W.D.Va. 1981); *Pan American World Airways, Inc. v. Folliard (Matter of Folliard)*, 10 B.R. 875 (D.Md.1981). *See also* 3 Collier, *supra* ¶ 523.14 at 523–94 n. 1. However, an officer will be personally liable to a corporate creditor for a defalcation only under special circumstances. Where the corporation itself is a "trustee", holding specific funds for the benefit of a particular creditor, a corporate officer who causes the misappropriation of the trust property by the corporation is personally liable for participating in the breach of trust committed by the corporation, even if the officer does not personally profit from the transaction. *Folliard*, 10 B.R. at 876. But where, as in this case, the funds at issue are general corporate funds,[14] the officer's duty is to use those funds for general corporate purposes. Thus, only a showing of misappropriation for a personal purpose or benefit will give rise to personal liability to corporate creditors. *Maguire v. Herzog*, 421 F.2d at 422.[15]

Plaintiffs here have offered no evidence at all that the debtors received a personal benefit from the misapplication of corporate funds; thus no debt arises to corporate creditors for any wrongdoing by Schultz acting as a corporate officer. Of course, Operating Engineers insist that their debt is a personal liability of Schultz, and not a liability of his corporation. Even assuming this is true, the debtor's liability arises solely by virtue of a contract obligation, and not from a defalcation in a fiduciary capacity.

## B. *Embezzlement*

Plaintiffs also proceed on the theory that their claims are nondischargeable in that they arise from the debtors' embezzlement. Unlike former § 17(a)(4) of the Act, § 523(a)(4) does not require that embezzlement be committed while acting in a fiduciary capacity; the sole question under the Code is whether embezzlement occurred. *Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 593–594 (Bankr.E.D.N.Y.1983).

The federal definition of "embezzlement" for dischargeability purposes is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come. *Graziano, supra* at 594; *Great American Insurance Co. v. Storms (In re Storms)* 28 B.R. 761, 765 (Bankr.E.D.N.C.1983). It differs from larceny only with respect to the manner in which the property comes into the possession of the party charged: In the case of larceny, the original taking must itself be unlawful or fraudulent. *See Graziano*, 35 B.R. at 594. Thus, three elements must be present: Property of another was entrusted to the debtor; the debtor appropriated the property to a use other than that for which it was entrusted; and the circumstances indicate fraud. The fraud required is fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud. *United States Life Title Insurance Company of New York v. Dohm*, 19 B.R. 134, 138 (N.D.Ill.1982).

Plaintiffs have failed to prove the elements of embezzlement. As discussed above, when the contractor receives pay-

---

14. As in the case of Schultz personally, the corporation, as contractor on the Mount Rose project, received payment pursuant to its own contract with the payor of the funds; thus the funds became the property of the corporation, and were not held "in trust" for the benefit of labor and material suppliers.

15. *See also Wachovia Bank & Trust Co. v. Banister (In re Banister)*, 737 F.2d 225, 228–229 (2nd Cir.1984); *Ealy Campbell Mobile Homes, Inc. v. Whitlock (In re Whitlock)*, 449 F.Supp. 1383 (W.D.Mo.1978).

ment, ownership of the funds passes to him. One cannot embezzle, steal, or convert one's own property. *Storms*, 28 B.R. at 765; *Kalmar*, 18 B.R. at 345; 26 Am. Jur.2d *Embezzlement* § 9.

This principle applies as well to the corporation which received payment as the contractor on the Mount Rose project. Ownership of the funds passed upon transfer to the corporation. Since the corporation cannot embezzle its own property, Schultz as a corporate officer cannot be held liable for causing or participating in any corporate wrongdoing. In addition, as noted above, there is no evidence at all that Schultz misappropriated or diverted corporate funds to any use other than for a corporate purpose.

■ Even if a contractor could be said to "embezzle" in this context, the Code requires clear and convincing evidence of fraud. *Graziano*, 35 B.R. at 593, and cases cited therein. Plaintiffs here have offered no evidence as to what the contractor did with the funds received; their proof amounts to no more than the bare fact that certain fringe benefits were not paid. With no evidence as to the extent of the alleged diversion of funds, or the circumstances surrounding the contractor's disposition of the funds, the Court cannot infer the requisite fraud. *See, e.g. Consumers Life Insurance Co., Inc. v. Staller (In re Staller)*, 4 B.C.D. 328, 331 (Bankr.D.N.J. 1978) (where insurance agent collected premiums but failed to remit them to insurance company, court could find no embezzlement or fraud without evidence as to what happened to the premiums).

The evidence presented to the Court militates against a finding of fraudulent intent or moral turpitude. On the Warren Estates job, the debtor sustained a $200,000 loss on his $1 million bid, while the delinquencies in the payments to the Teamsters and Laborers total less than $7,000. In addition, the only Teamster working on that project was the debtor's brother. These circumstances suggest a totally innocent default.

As for the Operating Engineers, their claim of little more than $1,000 in principal amount arises from the Mount Rose project, for which the bid was $4.5 million. The small amount of the delinquency compared to the total project cost could easily have been the result of an innocent mistake. Moreover, the debtor was only one corporate officer with access to corporate funds; there is no evidence that he had sole access or sole responsibility for payment of business expenses. Again, Operating Engineers insist that their claim against Schultz represents his personal liability, and not that of the corporation. However, they have failed to connect this liability to any wrongful diversion of funds, or any intent to deprive, deceive or defraud: The debt "arises from" a contract obligation, not from any conduct evidencing moral turpitude.

With no proof of any default other than the fact of nonpayment, the Court cannot find these debts nondischargeable. It hardly needs saying that the failure to pay a debt, without more, does not constitute clear and convincing evidence of fraud. *See Spurgeon v. Adams*, 24 B.R. at 255; *Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 437 (M.D. Tenn.1983). "A mere promise to be executed in the future is not sufficient to make a debt nondischargeable, even if there is no excuse for the subsequent breach." 3 Collier, *supra*, ¶ 523.08 at 523–45. Further, "the failure of a commitment made in good faith to make payment does not constitute actual fraud." *Id.* at 523–49. Plaintiffs here have failed to prove, by circumstantial evidence or otherwise, that the debts at issue arise from the "fraudulent appropriation" of property of another, or any other fraudulent conduct. The debtors should not be denied their "fresh start" based on the evidence presented here.

Plaintiffs contend that the Court should look to state law concerning embezzlement by contractors in order to find the subject debts nondischargeable. The relevant statutes, discussed above, are Nev.Rev.Stat. § 205.300, which declares it to be embezzlement when an agent uses property entrust-

ed to him for any purpose other than that for which it was entrusted; and Nev.Rev. Stat. § 205.310, which provides that a contractor who receives payment pursuant to a contract to supply labor and materials, "shall be deemed to receive the same as [an] agent ... for the purpose of paying all claims for labor and materials supplied". Apparently, the contractor who diverts his own funds to other uses, even if to pay other business expenses, is guilty of embezzlement of the funds so diverted. Furthermore, no intent to defraud need be shown. *Rose v. State,* 86 Nev. 555, 556–557, 471 P.2d 262 (1970) (the act of diverting itself makes the crime of embezzlement; "only the intent to do the act, even though not to steal, is important").

■ Plaintiffs have misconceived the applicability of state law in this context. Exceptions to discharge are a matter of federal bankruptcy law; state law may be consulted only to the extent that it is not in conflict with the Congressional policy of providing a fresh start to the honest debtor. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244–245, 54 S.Ct. 695, 699–700, 78 L.Ed. 1230 (1934).

The federal nature of bankruptcy law which grants the right of discharge, requires that the Court apply federal definitions and standards to the terms found in § 523(a)(2), (4), (6), as these sections are within the exclusive jurisdiction of the Bankruptcy Court. § 523(c). This has not always been the case. Prior to 1970, the dischargeability of individual debts was within state court jurisdiction. The 1970 amendments to the Bankruptcy Act which gave the Bankruptcy Court exclusive jurisdiction over the question of discharge of these types of debts (formerly found in § 17(a) of the Act) have been interpreted by many courts as creating a new federal right of action entirely distinct from any state cause of action. See, *e.g., Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *MacArthur Co. v. Crea (In re Crea),* 31 B.R. 239, 242 (Bankr. D.Minn.1983); *Kuehne v. Huff (In re*

*Huff),* 1 B.R. 354, 356 (Bankr.D.Utah 1979). These courts reason that

> the grant of exclusive jurisdiction over matters of dischargeability found in the 1970 amendments coupled with the interest in uniformity which prompted their passage, and in light of their failure to make any reference to state law, justifies a finding that federal law governs both substance and procedure of § 17 cases ...

*Crea, supra,* at 243. As one court concluded:

> [s]ince the passage of the Dischargeability Act, we are no longer sitting as a state court interpreting state law ... Rather, we sit today as a federal court interpreting a federal statute which provides the exclusive relief for a bankrupt and the exclusive remedy for a creditor ...

*Huff, supra,* at 356, quoting *In re Campbell,* No. 56018 (S.D. Ohio 1972) *aff'd on appeal* (S.D. Ohio, Feb. 12, 1973).

In *Storms,* the court considered the relationship between § 523(a)(4) and a state statute which deems it to be larceny for an insurance agent to fail to remit premiums collected to the insurance company. Applying the above principles, the court held the statute inapplicable in the dischargeability context, reasoning that the federal definition of "larceny" requires that the original taking itself be unlawful, a situation obviously not present in that case. 28 B.R. at 764–765. The court also stated that the debt did not arise from embezzlement, since it determined that the funds collected by insurance agents become the agents' property. As discussed above, one cannot "embezzle" what one owns. *Id.* at 765.

In *Crea,* the court dealt with a state statute which prescribes criminal penalties for "theft" when a contractor fails to pay for labor and materials after receiving payment himself. Since the statute lacks any requirement of intent to defraud, the court held that its violation does not give rise to a *per se* nondischargeable debt. 31 B.R. at 244. *Mettetal* similarly involved a state statute which provides that "the mere use

alone of proceeds by a contractor for any purpose other than payment of labor and materials on the project constitutes *prima facie* evidence of intent to defraud." 41 B.R. at 87. The court concluded that the statutory presumption of fraudulent intent conflicts with federal law in the dischargeability context, which requires that fraud be "affirmatively proven, not presumed." *Id.* citing *Heinold Commodities & Securities v. Hunt (In re Hunt)*, 30 B.R. at 436. *But see Lumbermens Mutual Casualty Co. v. Snellgrove (In re Snellgrove)*, 15 B.R. 149 (Bankr.S.D.Fla.1981). In *Hunt,* the court noted that proof of fraudulent intent may be accomplished through circumstantial evidence, but it is the plaintiff's burden to bring this evidence forward: State statutes which presume or imply fraud cannot be employed to establish fraudulent intent. 30 B.R. at 441.

 Therefore, since dischargeability is a matter to be determined by federal law, the violation of a state statute is relevant only where the state and federal definitions, and standards of liability and proof, are the same.[16] Under federal law, "embezzlement" requires that the debtor misappropriate property of another, and do so with fraudulent intent, with the burden on the creditor to offer affirmative, clear, and convincing evidence of fraud. The Nevada statutes at issue here require much less in the contractor-supplier context. Thus, even if Plaintiff's evidence were sufficient to show a violation of state "embezzlement" law, it would be subversive of federal policy for the Court to find that this is determinative of the dischargeability issue. As the court in *Crea* observed in a similar context:

> Such a holding would return this court to the position of a federal court interpreting state law. It would allow individual states to dictate the terms of dischargeability. If this were the case, the granting of a discharge would be far from uniform. These were the problems the

1970 amendments were designed to eliminate.

31 B.R. at 244. The state is free to define its property crimes as it wishes; but merely legislating that certain conduct is criminal and labelling it "embezzlement" is not controlling on this Court. Since the federal standards have not been met, the debts discussed herein are beyond the reach of § 523.

### Conclusion

Plaintiffs have failed to prove that their claims for fringe benefits arise from defalcation in a fiduciary capacity, or any type of fraudulent conduct such as embezzlement or larceny. Accordingly, the debts are dischargeable. Judgment shall be entered for Defendants.

---

**16.** The same principle applies in a dischargeability proceeding when considering whether to give collateral estoppel effect to a prior state court judgment. For the Ninth Circuit's position on this issue, see *Ozai v. Tabuena (In re Ozai)*, 34 B.R. 764, 765 (Bankr. 9th Cir.1983).