882 F.2d 302
 Bankr. L. Rep. P 73,046
In re Lloyd PHILLIPS.
FIRST NATIONAL BANK OF FAYETTEVILLE, ARKANSAS,
Appellee/Cross-Appellant,
v.
Lloyd PHILLIPS, Appellant/Cross-Appellee.
In re Stanley SISEMORE, Debtor.
FIRST NATIONAL BANK OF FAYETTEVILLE, ARKANSAS,
Appellee/Cross-Appellant,
v.
Stanley L. SISEMORE, Appellant/Cross-Appellee.
 Nos. 88-2378, 88-2495, 88-2616 and 88-2692.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1989.
Decided Aug. 8, 1989.
 
 Stephen L. Taylor, Springdale, Ark., for appellant/cross-appellee.
 Mark Lindsay, Fayetteville, Ark., for appellee/cross-appellant.
 Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSON,* District Judge.
 BEAM, Circuit Judge.
 
 
 1
 These appeals were consolidated for purposes of this opinion. Lloyd Phillips and Stanley Sisemore (debtors) appeal from an order of the district court affirming the bankruptcy court's determination that a debt owed by the debtors resulted from embezzlement and thus was nondischargeable under 11 U.S.C. Sec. 523(a)(4) (1982). We reverse and remand.
 
 I. Background
 
 2
 The debtors were officers and shareholders of Midwest Poultry Equipment, Inc. (Midwest). In November of 1984, the First National Bank of Fayetteville, ArkansasBorBank loaned $72,000 to Midwest to provide operating capital for the business. In order to secure the loan, Midwest granted FNB a security interest in certain proceeds that were due to Midwest under a lease. Pursuant to FNB's request, Midwest instructed McIlroy Bank and Trust Company to make the funding check for the lease payable to Midwest and FNB jointly in order to insure that FNB would receive the proceeds of the loan. In addition, each of the debtors executed a personal guaranty in favor of FNB to secure the debts of Midwest.
 
 
 3
 On January 7, 1985, Midwest received the funding check made payable only to Midwest and deposited it directly into its general account. When the debtors learned that the funding check had been improperly issued and deposited and that most of the funds from the check had been spent, the debtors did nothing to correct the error and did not notify FNB of the problem. Shortly thereafter Midwest ceased doing business and was unable to repay the loan from FNB. In October of 1985, the debtors and their respective spouses filed for bankruptcy under Chapter 7 of the Bankruptcy Code.
 
 
 4
 In January of 1986, FNB obtained a judgment against Midwest in state court in the amount of $85,403.02. On March 14, 1986, FNB filed a complaint in the bankruptcy court to determine the issue of the dischargeability of the debt owed by the debtors on the guaranties executed in favor of the Bank. FNB claimed that the debt was nondischargeable under 11 U.S.C. Sec. 523(a)(4) because it arose from embezzlement or larceny committed by the debtors or was nondischargeable under 11 U.S.C. Sec. 523(a)(6) because the debt resulted from the debtors' willful and malicious injury to or conversion of FNB's property.
 
 
 5
 The bankruptcy court held an adversary hearing and determined that the debtors had embezzled that portion of the funds from the funding check which was spent after the debtors learned that the check had been incorrectly issued solely to Midwest. This amount, which was determined to be $11,807.27, was held to be nondischargeable. The remainder of the debt was determined to be dischargeable. Following an appeal, the district court affirmed.II. Discussion
 
 
 6
 The debtors contend that the bankruptcy court erred in denying discharge of the debt to FNB. The debtors claim that they could not have embezzled the funds because, by definition, one cannot embezzle one's own property. The debtors allege that they owned the funds from McIlroy and had only granted FNB a security interest in the funds. FNB argues that it had more than a security interest in the property. FNB claims that the funds from the lease had been assigned to the Bank by Midwest and that they were, therefore, the property of FNB.
 
 
 7
 "Embezzlement, for purposes of [section 523(a)(4) ], is the 'fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " In re Belfry, 862 F.2d 661, 662 (8th Cir.1988) (quoting In re Schultz, 46 B.R. 880, 889 (Bankr.D.Nev.1985)). The evidence at the hearing showed that Midwest instructed McIlroy to make the funding check jointly payable and that Midwest was not responsible for the incorrect issuance of the check. Consequently, we find that the funds from the lease came lawfully into the hands of Midwest. The remaining question is whether the funds can be considered the funds of another, i.e., whether the funds belonged to Midwest or belonged to FNB.
 
 
 8
 The bankruptcy court did not address this issue, accepting FNB's characterization of the transaction as an assignment. Because Midwest did not "deny that such was the agreement with FNB," the court concluded that the funds belonged to FNB. In re Phillips, No. FA 85-201F, slip op. at 10 (Bankr.W.D.Ark. Dec. 8, 1986); In re Sisemore, No. FA 85-197F, slip op. at 10 (Bankr.W.D.Ark. Dec. 8, 1986). The district court addressed the issue somewhat more directly and concluded that an embezzlement had occurred because, although both the debtors and FNB had an interest in the property, the debtors had misappropriated the funds for their own benefit and the misappropriation was done through actions indicating fraud.
 
 
 9
 The determination of whether the debtors "owned" the funds from the lease is critical to ascertaining whether the debtors embezzled the funds. Thus, a close examination of the transaction is necessary. The security agreement of November 8, 1984, between the parties states as follows: "WHEREAS, Debtor desires to grant Secured Party a Security Interest pursuant to the Uniform Commercial Code in the following described property: Assignment of contract between Collateral Financial Services, Inc., buyer, and Midwest Poultry Equipment, Inc., seller, dated 4/11/84 in the amount of $218,532.00." Record at 8. The security agreement also states that FNB was granted a security interest in "Equipment." Id. One of the debtors, Stanley Sisemore, also executed, as president of Midwest, an assignment dated November 8, 1984, which "assign[ed] all my right, title and interest in contract described herein to First National Bank, Fayetteville, Arkansas as collateral for monies borrowed. Said contract being dated 4/11/84 in the amount of $218,532.00." Record at 12. In exchange for the "security interest" in the contract, FNB loaned Midwest $72,000 for six months.
 
 
 10
 Based upon our review of the transaction, we find that the parties intended this "assignment" to merely secure the debt owed to FNB. We do not believe that Midwest intended to assign a $200,000 contract as payment for a $72,000 debt as the documents suggest or that Midwest intended to assign the $72,000 funding check to FNB. Although the term "assignment" was used in parts of the documentation, the parties treated the transaction as the routine granting of a security interest. In addition, had Midwest actually assigned the funding check to FNB, there was no need for the check to be made jointly payable to Midwest and FNB, it should have been made payable to FNB alone. We, therefore, conclude that Midwest owned the funds from the check subject to the security interest of the Bank. The Bank's security interest does not give it an absolute ownership interest nor does it defeat Midwest's ownership interest. Because the funds belonged to Midwest subject to FNB's security interest, the debtors could not have embezzled the funds and the debt is not nondischargeable under section 523(a)(4).
 
 
 11
 Although section 523(a)(4) does not apply, FNB also asserts that the debt is nondischargeable under section 523(a)(6). Once the debtors discovered that the funds had been erroneously deposited in Midwest's checking account, they made the decision not to notify FNB and not to immediately repay FNB. The debtors contend that they believed that Midwest would be able to repay the loan from proceeds generated by the business and as a result concluded that it was not necessary to notify FNB. It has long been held that the breach of a security agreement may be sufficient to render a secured debt nondischargeable under section 523(a)(6). Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). However, the breach must be both willful and malicious. "Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge." In re Long, 774 F.2d 875, 882 (8th Cir.1985).
 
 
 12
 Clearly the debtors acted willfully when, after discovering that the check had been deposited in Midwest's account, they did not repay FNB immediately or, at least, pay over the amount remaining from the funds represented by the check. The agreement between the parties was that the funds from the lease would be paid to FNB. As to whether the debtors acted maliciously, the bankruptcy court considered this issue and concluded that the debtors sincerely believed that Midwest would continue to operate and generate sufficient revenues to repay the loan from FNB. As a result, the court found no evidence of malice.
 
 
 13
 A determination of the parties' intent is a question of fact. Drovers Bank v. National Bank and Trust Co., 829 F.2d 20, 22 (8th Cir.1987). We review a bankruptcy court's findings of fact using a clearly erroneous standard. In re Newman, 875 F.2d 668, 670 (8th Cir.1989). Based upon our extensive review of the record we cannot say that this finding of the bankruptcy court was clearly erroneous. The evidence showed that the debtors used some of the proceeds from the $72,000 check to pay creditors of Midwest to whom they were personally liable, and, therefore, directly benefited themselves. However, there was no evidence that their decision not to repay FNB was based upon anything other than an attempt to keep Midwest going as a viable business entity which would be capable of repaying FNB when the note became due. The debtors testified that they were developing a new cage system that had generated a great deal of interest in the farm community and, although they had no signed contracts to sell the new system in January of 1985, they were negotiating with several potential buyers. Apparently, a collapse of one of the new systems diminished customer interest in the project and, at least in part, brought about the demise of the firm. No evidence was presented to counter the debtors' testimony that but for this unforeseen event they intended to stay in business and repay FNB. Therefore, we find no intent or expectation on the part of the debtors to harm the economic interest of FNB.
 
 III. Conclusion
 
 14
 For the foregoing reasons the decision of the district court that part of the FNB debt is nondischargeable is reversed. The matter is remanded with directions that the FNB claim be dismissed in accordance with this opinion.
 
 
 
 *
 The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern District of Iowa, sitting by designation