**In re Betty Nimmo LAWRENCE, Debtor.**

**Ralph T. DEMPSEY, Jr., Joan S. Dempsey, Plaintiffs,**

v.

**Betty Nimmo LAWRENCE, Defendant.**

**Michael C. DUSSIA, Patricia M. Dussia, Plaintiffs,**

v.

**Betty Nimmo LAWRENCE, Defendant.**

**Robert K. AUGENBAUGH, Patricia S. Augenbaugh, Plaintiffs,**

v.

**Betty Nimmo LAWRENCE, Defendant.**

**Bankruptcy No. 80–00977.
APN 801070–801072.**

United States Bankruptcy Court,
E. D. Virginia,
Norfolk Division.

May 6, 1981.

James B. Lonergan, William B. Smith, Smith, Dickerson & Horne, P. C., Virginia Beach, Va., for plaintiffs.

Stephen R. Margulies, Norfolk, Va., for defendant.

HAL J. BONNEY, Jr., Bankruptcy Judge.

Betty Nimmo Lawrence [the debtor] filed a voluntary petition for bankruptcy on July 21, 1980. Her scheduled debts in excess of five million dollars, her scheduled assets somewhat less than three hundred dollars. Prior to filing, she had been engaged in business as president of and broker for Precision Realty, Inc., a Virginia corporation engaged in the general real estate trade, particularly for these purposes the resale and construction of residential real estate.

The instant complaints were filed on December 3, 1980. The plaintiffs based their causes of action on three distinct legal theories: (1) obtaining money by false pretenses, false representations and actual fraud, 11 U.S.C. § 523(a)(2); (2) fraud while acting in a fiduciary capacity, 11 U.S.C. § 523(a)(4); and (3) willful and malicious injury to the property of the plaintiffs, 11 U.S.C. § 523(a)(6).

By evidence that is clear and convincing the Court makes the following findings of fact. The debtor is and has been a licensed real estate broker since 1964. Precision Realty, Inc., was formed in 1976. The debtor was a principal stockholder in the corporation and served as president from its inception until its demise in early 1979.

In late 1977, early 1978, Precision began to move into a new area—the building of homes. C. B. Arnett, Jr., a real estate agent employed by the firm, was in charge of the day-to-day supervision of this aspect of the business. The firm built the homes in conjunction with Boyd and Boyd Construction Company.

Each of the plaintiffs, the Dempsey's, the Dussia's, the Augenbaugh's, entered into an agreement with Precision for the construction of a home. The ventures became ad-

ventures and were ill-fated. As work progressed, they were each approached by Arnett who told them it was necessary—and routine—for them to sign a "credit application" with Burton Lumber Company, a chief materialman on the project. The "application" was in effect a guarantee of payment.[1]

Then by mid-January, 1979, Precision had abandoned work on the homes. The funds paid to Precision, in escrow, by the plaintiffs,

| | |
|---|---|
| Dempsey | $21,300.00, |
| Dussia | 32,116.00, |
| Augenbaugh | 48,945.00, |

were depleted by Precision by the press of everyday events. Too, the plaintiffs have incurred large legal expenses as a result of all of these heartaches.

Although established in 1976, Precision had never been adequately capitalized. Further, the firm had never established sufficient financial controls. The firm normally maintained three separate checking accounts: an operating account, an escrow account and a construction account. The debtor had signatory authority on all three accounts. As the business declined, the debtor wrote numerous checks on the escrow account payable to cash or the Precision Realty operating account.

The last six to eight weeks of operation saw the complete unhinging of the company's limited internal financial controls. Checks were written on the construction and escrow accounts payable to cash and signed by the debtor. The testimony is that this money was used to satisfy the pressing needs of the business. Nevertheless, it is clear that the money was not applied in satisfaction of the obligations for which it was intended. Considerable funds were expended for what would have to be considered personal gain. Large checks were made payable to cash and checks to herself

as "repayments of loans" are ample evidence of playing with the funds of others. Further, the defendant as chief executive officer was aware of the interchange among accounts and the use of escrow funds for a variety of purposes.

The plaintiffs are seeking redress for situations caused in large measure by their own naivete; signing the credit application supplied by Burton Lumber Company was sheer folly. However, the gullibility of the plaintiffs does not rise higher than the dishonesty of the defendant. Thus, the Court finds the following as a matter of law.

■ The plaintiffs have failed to establish that the defendant willfully and maliciously injured their property. In order to prevail under this theory, it must be clearly demonstrated that the defendant harbored an intent to damage or convert the complainants' property. See, e. g., *In re Hodges*, 4 B.R. 513, 6 BCD 531 (Bkrtcy.W.D.Va. 1980), and cases cited therein. There has been no showing that the defendant fostered a scheme or plan to take advantage of the complainants. Simply put, the business collapsed and left in its wake a flood of litigation.

■ Likewise, there were no false pretenses or false representations, for no intent to defraud existed when the sales contracts were signed. *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967); *In re Maxwell*, 75–338–NN (Clarke, D.J. 1976). The defendant simply used their money for other purposes, but did not have a scheme with the plaintiffs in mind from the onset.

■ However, the plaintiffs have established that the defendant committed fraud while acting in a fiduciary capacity. It is abundantly clear that a real estate agent occupies a fiduciary relationship with his or

---

1. Burton has pursued these agreements against the plaintiffs in State Court where the final outcome is yet to be determined.

It is rather incredible that the plaintiffs had no attorney to advise them relative to the contract with Precision. A good attorney would have insisted on a bond. It is even more in-

credible that knowledgeable people would have signed the alleged guarantee with Burton. It was incomplete when signed and contained rather strong language. It was not necessary and should have been avoided.

But the gross naivete of the plaintiffs does not override the fraud of the defendant.

her clients. *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78 (4th Cir. 1954); Cf. *In re Miles*, 5 B.R. 458, 6 BCD 805 (Bkrtcy.E.D.Va.1980). A real estate broker is likewise impressed with this fiduciary obligation. The transfers of the funds advanced by the plaintiffs for unrelated expenses were fraudulent. *In re Brown*, 2 Bankr.Ct.Dec. 97 (E.D.Va.1975).

In the *Brown* case this Court encountered and spoke at length about this matter of real estate people using funds held in escrow. In short, it is the situation of a developer, contractor or broker who falls short of funds for any number of reasons, who uses funds in hand being held for future work and who anticipates restoring the funds from future contracts and payments thereon. In the *Brown* case the Court began the opinion with a quotation from a witness in the case:

> "To be honest with you, if that is the only way you built the United States—son, that is a practice in construction. You borrow from Peter to pay Paul, and when Paul goes broke, you rob Rosemary, and if not, you become a pimp and start putting somebody out on the street and get it done."—Witness Campo.

One would think this is not the prevailing practice in the trade. There are, obviously, perfectly reliable entities in the field. The matter is, unfortunately, a reoccurring one.

Brown stands for the proposition that one who receives such funds has a fiduciary responsibility to safeguard them and use them solely for the purpose intended. The law, this Court, will not abide the system.

The amount of damages to be awarded presents great difficulty. Other than legal fees incurred, no evidence was presented to reflect any other damages suffered by the plaintiffs.

The Dempseys have incurred legal fees of $10,786.50; the Dussias, $10,598; and the Augenbaughs, $18,977.

The debts are found to be nondischargeable in bankruptcy and the Court enters judgment for each plaintiff as set forth in the paragraph immediately preceding.

IT IS SO ORDERED.

A copy of this order shall be forwarded to the plaintiffs, the attorney for the plaintiffs, the defendant, and the attorney for the defendant.