**In re Charles L. BARKER, Debtor.**

**ESTATE of Virgil HENSEL, Plaintiff,**

v.

**Charles L. BARKER, Defendant.**

**Bankruptcy No. 3–82–01997.**
**Adv. No. 82–7421.**

United States Bankruptcy Court,
D. Minnesota,
Sixth Division.

May 14, 1984.

Gregory D. Larson, Park Rapids, Minn., John C. Quam, Detroit Lakes, Minn., for plaintiff.

Mark E. LeMay, Minneapolis, Minn., for defendant.

## MEMORANDUM OPINION

WILLIAM A. HILL, Bankruptcy Judge.

The above captioned adversary proceeding was commenced on December 6, 1982, by the filing of a Complaint seeking a determination that the debt owed by the Debtor to the Plaintiff was not dischargeable pursuant to 11 U.S.C. § 523(a)(4). Trial was held on April 16, 1984. After consideration of the evidence as adduced at trial and the briefs of parties, the Court finds the relevant facts to be as follows:

## FINDINGS OF FACT

The Debtor, Charles L. Barker (Barker) was at all times material, a Minnesota licensed real estate salesman associated with Century 21, Park Rapids Realty in Park Rapids, Minnesota, and in which he was part owner. In such capacity, he and Virgil Hensel (Hensel) on April 23, 1979, entered into a listing contract for the listing and sale of Hensel's Park Rapids home.

Barker procurred a purchaser for the house and on July 11, 1979, a purchase agreement was entered into with Mr. and Mrs. Andrew Amerslav for the total price of $47,000.00. The sale closed on August 7, 1979, with a down payment being made of $7,000.00. From this sum Barker deducted a 6% real estate commission and paid over the balance of $4,030.80 to Hensel.

The Amerslavs arranged to pay the purchase balance of $40,000.00 on a periodic basis over the ensuing months. Hensel was at that time in the process of moving to Texas to live with his son and in the Fall of 1979 did move to Texas. He authorized Barker to receive the remaining payments from Amerslav in his absence. These payments, according to Barker's testimony, were received by him with the oral understanding that he would invest them on behalf of Hensel. No writing evidenced this understanding until June of 1980. Barker received $10,800.00 from Amerslav in January, 1980, $18,400.00 in March, 1980 and a final payment of $12,410.09 in May of 1980. The total received by him from Amerslavs was $41,883.90. Amerslavs made their checks payable to the "Century 21 trust fund" and at trial, Barker testified that these checks were deposited in the Century 21 trust account.

Commencing with June, 1980, Barker began sending Hensel monthly checks for varying amounts. Hensel received $6,500.00 on June 25, 1980, and $1,500.00 on July 9, 1980. Thereafter, the monthly checks were in the sum of $500.00 and continued until March 3, 1981, when the last $500.00 payment was sent. No payments were made thereafter. The total paid to Hensel (excluding the original sum received from the down payment) was $12,000.00, including both principal and interest.

On July 25, 1980, Hensel and Barker signed a document entitled "Receive And Invest Agreement Fund". This document was prepared by Barker who testified at trial that it memorialized the earlier oral agreement between he and Hensel whereby Barker was given authority to do what ever he wanted with the money being received from Amerslavs so long as Hensel received monthly payments of principal and interest. Barker said that Hensel never placed restrictions upon what the money could be invested in. Rodney Karl, the only other person present at these discussions who testified, could not recall any particular direction by Hensel as to what to invest in. Hensel himself was deceased at the time of trial. Therefore, his version of the negotiations leading up the June agreement cannot be ascertained.

The terms of the written agreement are critical to an understanding of this case and that agreement, in part, provided as follows:

> "It is especially understood by both parties that Charles L. Barker is to receive and invest in certain projects the funds received from the sale of Virgil Hensel's property in the City of Park Rapids."
> . . . .

"These investments are so that Mr. Barker may allow specific buyers to borrow this money so that they may purchase certain property."

This agreement, according to Barker, gave him the authority to use the sale proceeds any way he saw fit so long as Hensel was earning the interest rate required.

Being unable to find anyone willing to pay the 12% interest specified in the agreement, Barker loaned the money to himself and used the money for his personal expenses, including the purchase of a car.

Barker, on January 10, 1980, prepared and signed two promissory notes, both payable to Virgil Hensel in the total sum of $37,772.61. The failure by Barker to pay Hensel the remaining sums from the sale of his house resulted in a lawsuit being commenced in Minnesota State District Court in December of 1980 seeking the recovery of the sums as evidenced by the two promissory notes. On July 17, 1981, the parties stipulated to judgment being entered in the sum of $42,000.00. The face total of the two notes is $37,772.61 but the State Court stipulation for judgment in the amount of $42,000.00 included principal, interest, attorney's fees and costs incurred to July 17, 1981. Judgment in this amount was entered by the State District Court without any determination ever being made as to the issues of fraud or conversion of trust funds which were alleged in the Plaintiff's original state action.

On December 18, 1982, Barker filed for bankruptcy and the instant adversary case followed by which Hensel seeks to have the entire $42,000.00 debt declared non-dischargeable. The $42,000.00 State Court judgment is not conclusive as to the amount remaining unpaid to Hensel. It does not take into account the fact that of the $41,883.90 Barker received from Amerslav between December, 1979 and May 1, 1980, he paid over to Hensel the sum of $12,000.00 representing principal and interest. This $12,000.00 payment, at least, should be deducted from the $42,000.00 State Court judgment in order to arrive at the true amount remaining unpaid to Hen-

sel from the Amerslav sale. This deduction leaves a sum due of $30,000.00 which in the opinion of the Court is a proper reflection of the amount remaining unpaid.

## CONCLUSIONS OF LAW

11 U.S.C. § 523(a) provides in part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

(4) for fraud or defalcation while acting in a fiduciary capacity.

The Plaintiff believes that Barker's use of the funds was restricted by the terms of the Receive And Invest Agreement. The agreement allegedly gave rise to a fiduciary relationship that was broken by Barker's use of the funds to his own benefit. Barker, on the other hand, takes the position that the agreement placed no restrictions on him at all and, citing *In re Paley*, 8 B.R. 466 (Bankr.E.D.N.Y.1981) and *Matter of Storms*, 28 B.R. 761 (Bankr.E.D.N.C. 1983), argues that the elements necessary for the existence of a trust relationship under section 523(a)(4) do not exist.

The meaning of the term "fiduciary capacity" in section 523(a)(4) is not clear from the statute itself. For many years, however, the Supreme Court has narrowly and strictly construed the exception to discharge for fraud while acting in a fiduciary capacity. The case frequently cited in connection with this concept is *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) where the Supreme Court in construing section 17 of the former Bankruptcy Act held that only debts arising from express or technical trusts are excepted from discharge as opposed to those imposed ex-maleficio. Later cases uniformly follow this decision. *See Matter of Dloogoff*, 600 F.2d 166 (8th Cir.1979). The issue then is whether the circumstances gave rise to a true fiduciary relationship between Barker and Hensel, or whether it was nothing more than one of a debtor and creditor.

As defined by Black's Law Dictionary, 753 (rev. 4th ed. 1968), one is said to act in fiduciary capacity when the money or property he handles is not his own or for his own benefit but for the benefit of another. In the context of section 523(a)(4) the relationship giving rise to fiduciary capacity must exist before the defalcation giving rise to the claim arose. Barker argues that the money he received from Amerslav was not the corpus of any fiduciary relationship but instead was tantamount to a loan between he and Hensel. The existence of the agreement between the parties belies such a simplistic argument. If the Court had nothing more before it than two promissory notes, then perhaps, this argument would prevail without further consideration. However, here there is a written agreement which purports to reduce to writing the understanding between Barker and Hensel, an understanding which when reduced to writing is presumed to incorporate all prior negotiations and agreements. Hensel, unfortunately, could not relate what his intent was when signing the agreement and thus, his intent must be derived principally from the written agreement itself. The agreement was drafted by Barker and any ambiguities therein will be construed more strongly against him for that reason and also for the reason that he was the only one of the parties who could advance his interpretation by trial testimony.

The *Paley* and *Storms* decisions cited by Barker follow the generally applicable law to the effect that a fiduciary relationship can only exist where there is a technical or express trust. This Court agrees but must note that *Paley* and *Storms* involved situations where the debtor was essentially a commissioned agent or broker of products routinely sold by him. *Paley* concerned a debtor who, as a travel agent, entered into a sales agreement with the Plaintiff to sell plane tickets. In *Storms* the debtor was an insurance agent. The debtors in both of these cases had as agents, a present right to sell a product and to receive payment for the product sold. As tickets or insurance policies were sold the money received belonged to the agent, the only obligation being for them to eventually pay their principal whose sole role was essentially that of a wholesaler or supplier. Barker's relationship with Hensel was quite different in that Hensel was the seller of the product (his home) and as such, he had the absolute right to immediate payment once the purchase contract had closed. Under normal circumstances, Barker would have had no right whatsoever to receive or retain any payments from the seller after closing. Hensel authorized Barker to become his agent for collection purposes because he was leaving the area. At that point, the right of payment still flowed from Amerslav to Hensel. Barker and Hensel then entered into an agreement as expressed in the June 25, 1980 writing whereby Barker was to:

1. receive the Amerslav payments, and
2. *invest the funds in certain projects.*

The money always belonged to Hensel, it never belonged to Barker and this is the distinction that must be understood by the agreement. Hensel gave the funds to Barker for investment purposes. The writing further states that the investments are to be in "certain property". Although it is not entirely clear from the agreement exactly what type of investments the parties had in mind, the Court believes they intended something more than merely a loan agreement. The document makes reference to "investments" more than once and also refers to "certain projects" and "property" as an object of the investment. The Court believes Hensel entrusted his money to Barker with the intent that Barker would invest it for him in projects involving real property. Barker's business was real estate and certainly this would not have been an unusual investment for him to make. It does not seem likely, as Barker argues, that the agreement expressed a mere intention by Hensel to simply loan

Barker himself the $40,000.00. This could certainly have been done without an agreement captioned as an "Invest Agreement".

The situation here is more kin to the facts of *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78 (4th Cir.1954), where a real estate agent had been given funds by a real estate purchaser with the express intent that they be used to pay off liens that existed on the property. Such a situation said *Hamby* gave rise to more than a constructive trust because the agent had been entrusted with money to be used for a specific purpose. This, said the Court, gave rise to a fiduciary capacity in the agent. Similarly, the case of *In re Lawrence*, 10 B.R. 853 (Bankr.E.D.Va. 1981) held that a real estate broker is impressed with a fiduciary obligation to administer funds advanced by a principal consistent with the purpose for which they were advanced. In that case a real estate agent had been given money to apply towards construction costs incurred in the construction of the principal's home. Rather than making such application, the agent used the money to her personal ends. The Court held that one who receives such funds has a fiduciary responsibility to safeguard them and use them only for the purpose intended.

In the instant case it seems clear from the facts that Barker did not use Hensel's money for the purpose intended. The purpose expressed in the agreement was for Barker to invest Hensel's money in real property. Rather than investing the funds consistent with this purpose, Barker used the funds for his personal expenses.

Accordingly, the Court finds that the Defendant has committed fraud while acting in a fiduciary capacity and the outstanding indebtedness owing to Hensel is found to be non-dischargeable in bankruptcy. From the facts, the sum due Hensel and thereby found to be non-dischargeable is the sum of $30,000.00.

JUDGMENT MAY BE ENTERED ACCORDINGLY.