**In re TWIN VALLEY SEED COMPANY, Debtor.**

**Bankruptcy No. 84–05615.**

United States Bankruptcy Court,
D. North Dakota.

Sept. 5, 1985.

---

**6.** The trustee does not argue that he informally or implicitly assumed the agreement at any time.

Jon Brakke, Fargo, N.D., for debtor.

Edward F. Klinger, Moorhead, Minn., for Unsecured Creditors Committee.

Ralph Hansen, Moorhead, Minn., Examiner.

Michael LeBaron, Minneapolis, Minn., for debtor.

Joel Johnson, Moorhead, Minn., for Ass'ns.

William Westphal, U.S. trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court on the objection of the Debtor, Twin Valley Seed Company, to the claims of South Central Idaho Bacterial Blight Control Association, Inc. of Jerome, Idaho (SOUTH CENTRAL) and Southwestern Idaho-Malheur Co. Oregon Bacterial Blight Control Association, Inc. of Caldwell, Idaho (SOUTHWESTERN) in the sum of $41,943.00 and $4,042.50 respectively. Originally filing as unsecured creditors, the Associations later amended their claims asserting secured status. $45,000.00 is currently held by the Debtor in escrow as adequate protection for these claims pending their determination.

The parties have submitted a Stipulation of Facts and have agreed the Associations' claims may be determined on that basis. From the Stipulation of Facts and the attendant documents, the facts as material may be stated as follows:

## FINDINGS OF FACT

### 1.

Both of the Associations are Idaho non-profit corporations organized by seed bean growers in order to assist them in the control and prevention of bean diseases. For the period from planting until October 15, 1984, both Associations entered into agreements termed "Membership Application and Pooling Agreement" with their respective growers. For 1984, South Central obtained Agreements covering 27,120 acres, and Southwestern had Agreements covering 14,225.9 acres. The Agreements utilized by each Association are identical in their terms as material to the issues except as noted herein. The Agreements provide that the member grower will be assessed for "dues" (the per-acre assessment is referred to in the parties' briefs as "dues"; the Agreements themselves refer only to

"Assessments") up to a maximum of $15.00 per harvested or blight-destroyed acre ($7.50 per acre in the case of Southwestern) and that the Agreement would be treated as a crop assignment in favor of the Association exercisable in the event the per acre assessment is not paid by the grower. The Association agreed to act as collecting and disbursing agent for pooled funds and would disburse collected funds to injured growers up to a maximum of $300.00 per acre ($450.00 per acre for Southwestern). The Grower Agreements further indicate that the Cooperating Company will sign a separate cooperating agreement. In the event the participating grower does not pay the per-acre assessment in cash, the grower, by the terms of the Agreement, authorized the Cooperating Company to sell enough beans to meet the assignment before December 1, 1984. The South Central Agreement states that the Cooperating Company will honor the Grower Agreement as a crop assignment in favor of the Association. There is no such reference in the Southwestern Agreement. The Agreement further provides that the Association will notify the Cooperating Company by November 15, 1984, of any assessments against a grower. Twin Valley is not a signatory to the Membership Application and Pooling Agreement.

The Debtor, Twin Valley Seed Company, as a Cooperating Company for the year 1984, entered into a separate agreement called a "Company Agreement" with each of the Associations. As material to the issues herein, the two Agreements are identical. By terms of the Company Agreement, the respective Associations agreed in part to make assessments to the Cooperating Company before November 15, 1984. The Cooperating Company, for its part, agreed to collect and turn in the assignments set by the Association prior to December 1, 1984. The Company Agreement does not contain any provision obligating the company to honor the Grower Agreement as a crop assignment nor does it obligate the company to hold back, set off, or pay the grower per-acre assessment. The Company Agreements do not specifi-

cally refer to the company as agent of the Association for any purpose. There are no other documents evidencing the obligations of the Associations, the growers or Cooperating Company beyond the Membership Application and Pooling Agreement and the Company Agreement. Beyond these two Agreements, there are no other security agreements or financing statements.

2.

During the 1984 season, 1,278 acres under agreement with South Central were destroyed and, pursuant to its Grower Agreements, South Central became obligated for payment to those growers of $383,-400.00 at $300.00 per acre. Southwestern, by virtue of similar circumstances, became obligated to its participating growers for $101,250.00 at $450.00 per acre for 225 acres. Of the total harvested acres, 2,796 acres were under Grower Agreement with South Central, and 550 acres were under the Southwestern Grower Agreement. Based upon the South Central Grower Agreement, this meant that participating growers of harvested crops would be assessed $15.00 per acre assessment, and those participating with Southwestern would be assessed $7.50 per acre. The total per-acre assessment due from growers to South Central for the 1984 crop season was $41,942.00, and the total per-acre assessment due Southwestern from its growers for the 1984 crop season was $4,042.50.

Rather than the Association making a demand of the grower for cash payment of the per acre assessment as provided for in the respective Grower Agreements, the practice since 1979 was for the parties to wait until there had been a settlement between the grower and Twin Valley. Twin Valley, according to past practice, would deduct the per-acre assessments from payments due the participating growers and later pay this sum to the Associations.

Twin Valley filed for relief under Chapter 11 on December 10, 1984. As of the date of filing, neither South Central nor Southwestern had collected the per-acre as-

sessments for 1984 nor had Twin Valley made any payment to growers from which the per-acre assessments had been deducted. The Debtor, anticipating making a deduction from its grower payments in consequence of these per-acre assessments, had entered in its books and records an obligation due South Central for $41,943.00 and an obligation due Southwestern of $4,042.50.

## CONCLUSIONS OF LAW

The Associations first of all argue that, by virtue of the crop assignment evidenced by the Grower Agreements, they had a security interest in all beans delivered by member growers to Twin Valley; that Twin Valley was an agent of the Associations for: signing up growers to the Grower Agreements, collection of the per-acre assessments and collection of the crop assignments; that by virtue of this agency relationship the Associations' security interest in the beans was perfected by Twin Valley, as its agent, taking possession of the bean crop. The Associations also urge that, by virtue of Twin Valley's agency status, a fiduciary relationship arose whereby Twin Valley held all beans delivered to it in constructive trust for the Associations in consequence of the per-acre assessment and had a fiduciary duty to turn over the sums of $41,943.00 and $4,042.50 representing the Associations' per-acre assessments. The Associations ask the Court to now find that Twin Valley held the beans as constructive trustee for the payment of these per-acre assessments and that the proceeds of the sale of Twin Valley's bean inventory are also subject to the constructive trust.

Twin Valley asserts that any claimed security interest in beans delivered to it is voidable under section 544 of the Bankruptcy Code because of the Associations' failure to perfect in compliance with the Uniform Commercial Code. Twin Valley also challenges the assertion that under the terms of the Company Agreement, it became the Associations' agent; that its only obligation was to collect assignments actually set by the Associations. Because it was not the Associations' agent, no fiduciary relationship existed; and, hence, a constructive trust did not arise. Twin Valley finally argues that in absence of a security interest perfected pursuant to the Uniform Commercial Code, the Associations have no property interest in the beans to which a constructive trust could attach, and their claims can be regarded as nothing more than unsecured obligations.

The issues thus framed appear complex and overlapping but may be reduced to these essentials: First, what obligation did Twin Valley have under the terms of its Agreement with the Associations with respect to the beans delivered to it; secondly, what obligation did Twin Valley have under the terms of its Agreement with the Associations regarding the per-acre assessment?

1.

■ The relationship between the Associations and Twin Valley is not defined nor affected by the Membership Application and Pooling Agreements. These Agreements, individually entered into by each participating grower member and the respective Association, are binding as to those parties only. The Cooperating Company is not identified on the form and did not sign it. Consequently, a Cooperating Company such as Twin Valley cannot be held to any obligation that might be imputed to it by the language of the Grower Agreements.

Whatever relationship exists between the Associations and Twin Valley, as a Cooperating Company, must spring from the Company Agreement itself or from the parties' course of dealing. The Associations, believing a fiduciary relationship to exist by virtue of an agency relationship, places their reliance not only upon the language of the Company Agreement but in the existence of an implied agency as well.

■ Agency is a relationship created by agreement. It depends upon the existence of an agreement and the consent between the parties that an agency exists.

Although consent may be either in express language or implied from conduct, that consent must show the principal intended the agent to act for him and the agent intended to accept the authority and act upon it. *Thornton v. Budge,* 74 Idaho 103, 257 P.2d 238 (1953); 3 Am.Jur.2d Agency, § 17, 18. If the agency is to be implied from conduct rather than written contract, that conduct, whether words, prior habit or course of dealing, must be of such a nature or degree that when reasonably interpreted one is left with the conviction that the parties, through such conduct, actually place themselves in an agency relationship. *Growe v. Hertz Corp.,* 382 F.2d 681 (5th Cir.1967); *True v. High-Plains Elevator Machinery, Inc.,* 577 P.2d 991 (Wyo.1978); Restatement (Second) of Agency § 26 (1957). Regardless of whether the agency is expressed from a written document or implied from conduct, the essential elements of intention to create an agency and manifestation of such intent must be shown to exist. *True v. High-Plains Elevator Machinery, Inc.,* 577 P.2d at 998. Idaho courts, relying upon the Restatement definition of agency, have held that the intent of both parties must be manifested. *Thornton v. Budge,* 74 Idaho 103, 257 P.2d 238 (1953); *Gorton v. Doty,* 57 Idaho 792, 69 P.2d 136 (1937); *Jensen v. Sidney Stevens Implement Co.,* 36 Idaho 348, 210 P. 1003 (1922). The party alleging agency has the burden of proof both as to the existence and nature of the alleged agency. *True v. High-Plains Elevator Machinery, Inc.,* 577 P.2d at 997. If an agency relationship is found to exist, then the agent is a fiduciary with respect to matters within the scope of the agency. Restatement (Second) of Agency § 13 (1957).

■ Although the Associations are correct in stating that state law should be looked to in determining the existence of a fiduciary relationship, *Jaffke v. Dunham,* 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957); *Elliot v. Bumb,* 356 F.2d 749 (9th

Cir.1966), as we have seen, the courts of Idaho in discerning whether or not particular circumstances establish an agency relationship rely upon generally applicable law. In this posture, we now turn to first an examination of the written Company Agreement by which the Associations believe Twin Valley agreed to procure grower Membership Applications, collect and turn over the per-acre assessments, and collect and turn over the crop assignments. The Court cannot find such an expansive intention expressed in the documents. There is no reference whatsoever to any agreement on the part of Twin Valley to collect or, indeed, to do anything with the per-acre assessment. The only obligation Twin Valley had with regards to procuring Membership Applications was to have the forms available and assist in signing up growers. To the Court, this cannot be read as an intention on the part of either party that Twin Valley assumed an obligation to "procure" grower memberships. As for the crop assignments, Twin Valley was to collect and turn in the assignments "set" by the Association by December 1, 1984.[1] By express terms, Twin Valley's obligation was only as to specific crop assignments which were set by the Associations. There was no written obligation to act as the Associations' agent generally as to the assignments until and unless first set by the Association. Once set, Twin Valley had an obligation to collect and turn in the assignments. However, it is not clear from the Company Agreement that Twin Valley, by virtue of this obligation, became the Associations' agent. The crop assignments were from specific growers to the Associations and were immaterial to a cooperating company's relationship with a grower until an association, pursuant to the terms of the Grower Agreement, elected to pursue its rights under the assignment rather than seek cash payment from the grower. If electing to pursue its assignment remedy,

1. The term "set" is not defined in the Company Agreement nor is it defined in the Stipulation of Facts or the parties' Briefs. This Court's research did not reveal a particular legal usage but, from its manner of use, the Court believes it to mean the fixing of the value or extent of the grower assignments.

the Association had to take an affirmative step before any obligation on the part of the Cooperative Company was triggered—it had to "set" the particular assignment. Failure to take this step left a Cooperating Company without any obligation whatsoever with regards to the Associations. Once "set", the Cooperating Company's obligation was to simply honor the assignment by surrendering beans from its own inventory. There is no evidence suggesting that the Associations ever set the 1984 crop assignments. Contrary to the Associations' interpretation, this Court, after reviewing the language of the Company Agreement, does not reach the conclusion that Twin Valley thereby agreed to become the Associations' agent.

■ Nonetheless, the course of conduct between the Associations and Twin Valley was, for a number of years, at variance with the written agreement. Rather than demanding Twin Valley to honor the Grower assignments by liquidation, the Associations looked to Twin Valley instead of the grower himself for cash payment of the per-acre assessment. Up to the time when Twin Valley filed its bankruptcy, no request by the Associations had been made for liquidation of the assignments. Hence, as mentioned, Twin Valley had no obligation to set aside or sell bean inventory in recognition of the assignments. The question becomes, however, whether by the parties' course of practice, Twin Valley became the Associations' agent for collection of the per-acre cash assessment. Since 1979, Twin Valley deducted in cash the per-acre assessments from its payments due to the growers for beans sold and delivered by them to Twin Valley. These deducted amounts would then be turned over to the respective Associations. This method of satisfying the per-acre assessments is not provided for in the written Agreement but was the understood and accepted course of dealing between Twin Valley and the Associations. Did Twin Valley thereby impliedly become the Associations' fiduciary for purposes of collecting and turning over the per-acre assessment? The Associations argue that an

agency relationship did exist and that the fiduciary relationship necessary for the imposition of a constructive trust thereby exists. Whether the parties' relationship is labeled as principal/agent or beneficiary/trustee, the existence of such relationship depends upon Twin Valley's intent, express or implied, to assume a fiduciary relationship and deal with certain funds for the benefit of the Associations. With regards to money, even in the face of express trust language, courts will not find a fiduciary relationship to exist where there has been no effort on the part of the alleged trustee to segregate funds or treat them any differently than money in its general account. Several cases cited by counsel for Twin Valley bear on this issue. In *Carlson, Inc. v. Commercial Discount Corporation*, 382 F.2d 903 (10th Cir.1967), the debtor had expressly agreed to hold the claimant's daily cash proceeds "in trust". The court, affirming the decision of the bankruptcy court, noted that there was nothing to indicate that the debtor was collecting money on behalf of the claimant; rather, all money came from sales made in the debtor's name with the understanding the proceeds would be co-mingled with those of the claimant. The source of the funds to be later turned over to the claimant was the debtor's own general fund, a fund which it had unrestricted use of. Similarly, in *In re Penn Central Transportation Company*, 328 F.Supp. 1278 (E.D. Pa.1971), the claimant sought to recover proceeds of ticket sales held by the debtor in consequence of an express agency agreement. In denying the existence of a fiduciary relationship, the court noted the crucial factor in distinguishing a fiduciary relationship from an ordinary debtor/creditor relationship was whether the recipient of the funds was entitled to use them as his own and co-mingle them with his own. *See also In re Lord's, Inc.*, 356 F.2d 456 (7th Cir. 1965); *In re Alda Commercial Corporation*, 327 F.Supp. 1315 (S.D.N.Y.1971); *In re Dexter Buick-GMC Truck Co.*, 2 B.R. 247 (Bankr.D.R.I.1980). Each of these cited decisions involved situations where

there existed written documents purporting to define the parties' relationship with regard to particular funds as one of trust or agency. The case of *In re Barker*, 40 B.R. 356 (Bankr.D.Minn.1984), decided by the undersigned, is one case where the fiduciary relationship was found to exist. In that case, the claimant had entrusted proceeds from the sale of his home to his real estate agent for specific investment purposes. When the agent misappropriated the funds, he was found to have committed a fraud while acting in a fiduciary capacity. In *Barker*, the money belonged to the claimant, and the agent had no present right to receive or retain the funds except as specifically authorized by written agreement. The agent had no right to co-mingle the claimant's money with his own or do anything with it except to make an investment as directed. In the instant case, the Associations are not armed with a specific written agreement purportedly establishing a trust fund for the per-acre assessments. Here, we have only a course of dealing to look to. First of all, the funds from which Twin Valley was to pay the per-acre assessment were its own funds. The money did not come into Twin Valley's hands as a consequence of doing business with or on behalf of the Associations. Thus, as initially generated these funds came from sources wholly unrelated to the Associations. Twin Valley had no duty to account to the Associations for the money as it received it and had no duty to segregate the funds or do anything other than to treat the money as its own general fund. Twin Valley's only obligation as a business was to pay its obligations, including those obligations to growers who sold their beans to it. Even then, however, there was no duty to segregate or earmark portions of its general revenues for that purpose. At the time when a grower was to be paid, Twin Valley would, based upon past practice, set off from that grower's money a specific sum representing the *grower's* per-acre assessment obligation to the Association. It was the grower's money, not the Association's, that was being held back as a consequence of the assessment, and by the terms of the Grower Agreement, it was the grower's obligation to pay the per-acre assessment. No mention is made in the Stipulation of Facts regarding the grower's acceptance of or acquiescence to this arrangement, but surely the grower's approval was necessary for the deduction to be made from money Twin Valley owed to the grower. Presumably, if the deduction were not made by Twin Valley, the Associations would look not to Twin Valley for ultimate payment but to the grower who was a party to the Agreement specifying a per-acre cash assessment.

The facts and circumstances of this case do not establish a fiduciary relationship between the Associations and Twin Valley with respect to the per-acre assessments. Consequently, no constructive trust is found to exist as to any portion of Twin Valley's cash now existing.

2.

Irrespective of whether a fiduciary relationship exists, the Associations also assert that they hold a security interest in Twin Valley's bean inventory and proceeds by virtue of the growers' crop assignments, assignments which are not subject to section 544 avoidance. It is well to keep in mind that the crop assignments in question were assignments by the growers of growers' beans intended as an alternative means of collecting the per-acre assessment in the event the growers did not pay the assessment in cash. It was not a present assignment of beans but intended only as security for the per-acre assessment in the event the cash payment was not made. When the growers sold beans to Twin Valley, the assignment was effective as between the grower and the Association. The Associations argue that Twin Valley could not take the beans free of the assignments because, as a purchaser of a farm product even in the ordinary course of business, it would remain subject to a security interest created by the growers. Reliance is placed upon Idaho Code § 28-9-307 which subsumes that the security interest claimed by the Associations is perfected. Here, the Associations claim perfection was

accomplished by the Debtor as the Associations' agent taking possession of the beans, thereby accomplishing perfection by possession. Idaho Code § 28–9–305 does provide for perfection of a security interest in goods by the secured party taking possession. However, this Court does not agree with the Associations' assertion that when Twin Valley purchased the beans from the growers, it did so as their agent. The argument for perfection by possession fails for this reason. Parenthetically, even if Twin Valley as Debtor was an agent of the Associations, it appears that under applicable law that agency could not stand as a means of perfecting the Associations' interest as creditor in collateral held by Twin Valley. *Matter of Staff Mortg. & Inv. Corporation*, 550 F.2d 1228 (9th Cir.1977). If the Associations' security interest in the guise of a crop assignment is to be effective against Twin Valley, it must be perfected. Idaho Code § 28–9–302(1) does not provide for any exception for crop assignments and, as construed by the Bankruptcy Court for the District of Idaho, a security interest in crops must be perfected in compliance with Article 9 in order to be valid as against a debtor-in-possession. *In re Wood*, 38 B.R. 375 (Bankr.E.D.Idaho 1983). From the facts of this case, it is established that no financing statement was filed. The Associations' claimed security interest is unperfected and is subject to the avoidance powers accorded the debtor-in-possession by virtue of section 544. Under section 544(a), a trustee at the time of the bankruptcy filing becomes vested with the status of a hypothetical lien creditor without knowledge, giving it rights paramount to the holder of an unperfected security interest. *In re F.R. of North Dakota, Inc.*, 54 B.R. 645, 41 U.C.C.Rep.Serv. 265 (Bankr.D.N.D.1985); *In re Galvin*, 46 B.R. 12 (Bankr.D.N.D.1984). In such capacity, Twin Valley must be presumed to be without knowledge of the fact that the growers' beans were incumbered by a crop assignment at the time they purchased them from the growers. *See In re Flaten*, 50 B.R. 186 (Bankr.D.N.D.1985); *In re Trestle Valley Recreation Area, Inc.*, 45 B.R. 458 (Bankr.D.N.D.1984).

For the reasons stated herein, the claims of South Central Idaho Bacterial Blight Control Association, Inc. and Southwestern Idaho-Malheur Co. Oregon Bacterial Blight Control Association, Inc. are unperfected and entitled to no special status. The claimants are accordingly entitled to having their claims treated as unsecured claims.

IT IS SO ORDERED.